THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

I.R. by Elizabeth Robinson and William          :
Robinson, individually, and as                  :
Parents and natural guardians,                  :
                                                :
                    **Plaintiffs**              :
                                                :
    v.                                          :        **3:10-CV-398**
                                                :        **(JUDGE MARIANI)**
**FORREST MARSHALL PEIRCE,**                    :
**POCONO TRANSPORTATION, INC.,** and            :
**NORTH POCONO SCHOOL DISTRICT**                :
                                                :
                    **Defendants**              :

## MEMORANDUM OPINION

### I.  Introduction

Before the Court are Defendants' Motions for Summary Judgment (Docs. 40, 42), all

accompanying briefs, Magistrate Judge Mannion's Report & Recommendation ("R&R")

(Doc. 59), Defendants' Objections (Docs. 60, 62), and Plaintiffs' Briefs in Opposition to

Defendants' Objections (Docs. 63, 64).  For the reasons set forth below, the Court will adopt

in part and reject in part Judge Mannion's R&R, and grant in part and deny in part

Defendants' Motions for Summary Judgment.

### II.  Statement of Facts and Procedural History

Plaintiffs filed a complaint in the Lackawanna County Court of Common Pleas

against Defendants Peirce, Pocono Transportation, Inc, ("PTI") and North Pocono School

District ("NPSD"), who removed the case to federal court.  (Doc. 1).  In their Complaint,

Plaintiffs claim that on September 19, 2006 at approximately 3:30 pm, minor Plaintiff I.R. was a passenger on a school bus owned by PTI and driven by Peirce. ("Compl.", Doc. 2, at ¶¶ 6, 10). At that time, Peirce announced that a bus evacuation drill was taking place and instructed the students to exit the bus through the rear door. (*Id.* at ¶ 10). While complying with Peirce's instructions, I.R. sustained a closed and transverse fracture of the right femur when he jumped out of the back of the bus. (*Id.* at ¶¶ 10, 11).

I.R. suffers from osteopetrosis, a serious bone disease which makes his bones more easily susceptible to injury than one without the disease and which has caused acute vision problems. (*Id.* at ¶ 8). When I.R. was six years old, Dr. Randall Peairs diagnosed his vision as 20/200 in his right eye and 20/400 in his left eye, which could not be corrected with either glasses or surgery. (Doc. 53, Ex. A, at 28). Four years later, I.R.'s vision was 20/100 in his right eye and remained at 20/400 in his left eye. (*Id.* at 88).

Since second grade, I.R. had been receiving Individualized Education Progra,s ("IEPs"), which I.R.'s mother, teachers, and guidance counselor had collectively participated in creating each school year. (Doc. 53, Ex. A, at 15 *et seq.*). In March 2004, Nancy Scheirer, an Operation and Mobility Services Specialist, recommended that I.R. "be provided with instruction in the use of a white cane and appropriate cane techniques to allow him to continue moving safely and independently in the event of further vision loss." (*Id.* at 46). His fifth grade IEP incorporated these cane recommendations. (*Id.* at 56). The IEPs always accommodated I.R's vision problems by providing him extra time to complete

2

assignments, large-print texts, breaks to prevent visual fatigue, cassette tapes for extended readings, etc. (*See id. generally*).

I.R's doctors also forbade him from participating in contact sports in gym. (E. Robinson Dep., Doc. 53, Ex. B, at 15:14-16). When it came to activities that could potentially be dangerous to I.R, his mother said, "he knew better what he was supposed to do and not supposed to do." (*Id.* at 20:13-15). She also stated that she never informed her son's regular bus driver, June Cole, of her son's condition because she assumed that the school would inform Mrs. Cole. (*Id.* at 21:8-16). She admitted that she was aware that the school regularly conducted bus evacuation drills. (*Id.* at 23:7-13; 25:6-11). I.R. also never informed his bus driver of his condition. (I.R. Dep., Doc. 53, Ex. C, at 29:11-15).

I.R. had participated in bus evacuation drills every year that he had ridden the school bus. (*Id.* at 30:18-31:3). As recently as sixth grade,[1] a teacher had helped him in the rear bus evacuation drill. (*Id.* at 31:12-32:5). He was expecting a teacher to be there to assist him on the date in question, but when he saw there was no one to help him on the date of his accident, he "didn't want [Peirce] to yell at me or anything, because [I.R.] heard [Peirce] was a mean bus driver." (*Id.* at 40:13-18). So, instead, he "sat down on the edge of the bus and tried to scoot out" (*Id.* at 36:18-20), thereby sustaining the injuries in question.

The Pennsylvania School Bus Driver's Manual (Doc. 56, Ex. B) sets forth the requirements that drivers should adhere to when conducting evacuation drills. In a "Rear

---

[1] NPSD asserts that it was a policy that teachers would be available to assist for grades K-5 only and not for grades 6-12, thereby disputing I.R.'s assertion that a teacher had assisted him in a bus evacuation drill in sixth grade. (Strempek Dep. Doc. 41, Ex. H, at 21:19-22:9).

3

Emergency Door Evacuation Drill," the bus driver should "[w]alk to the rear of the bus and face [the] rear door" (*Id.* at H-14, ¶ 5) to supervise the students' exit and ensure that proper safety procedures are followed. "State law requires each student who is transported in a school bus or school vehicle to participate in emergency evacuation drills in the first week of school and in March of every school year." (*Id.* at H-12). However, "[s]tudents who are injured, disabled, or in a condition that may be aggravated by jumping out of the bus . . . should not be required to participate in the drill." (*Id.* at H-14, 15, ¶ 11).

Peirce testified that he had been in the bussing business since 1971. (Peirce Dep., Doc. 56, Ex. A, 7:11-13). He also confirmed that he had experience executing rear emergency door evacuation drills "since back in the '70s." (*Id.* at 23:11-16; 24:19-20). However, he stated he was not aware that on September 19, 2006, any of the students on his bus had "special needs." (*Id.* at 25:1-4). Plaintiffs dispute this point, arguing that I.R.'s condition was apparent to anyone who observed his stature and gait. (W. Robinson Dep., Doc. 54, Ex. G, at 26:9-19). I.R. never expressed a desire to sit out of the drill (Peirce Dep. at 59:15-18), nor did Peirce himself notice anything unusual about I.R. that would have raised a doubt in Peirce's mind about whether I.R. could participate in the drill. (*Id.* at 60:1-6).

Peirce admitted at his deposition that at the beginning of the drill, he told the students "today, we're all going to go out the rear emergency door. We're all familiar with the front. We go in and out of it twice a day. We're going to use the back door." (*Id.* at

26:7-11). However, he did not announce that students were not required to participate. (*Id*. at 29:8-10). He was "right up in the front of the bus by the driver's seat" when "[s]ome of the other students" told him that "one of the students was hurt in the back." (*Id*. at 26:18-25).

When counsel asked Peirce why he had not adhered to the Manual's procedures for rear exit evacuation drills, he answered, "I've done the drills for a long time. The children need – part of doing the drill is so that they get hands-on experience doing it. I might not be able to help them in the rear – in the real emergency, or any driver." (*Id*. at 30:23-31:4). He further explained that he remained in the front because in his experience, there are some children who "want to be the bus clown" and crawl under the seats to avoid participating in the drill. (*Id*. at 32:9-12). Finally, he stated that no representative of the state had ever tested him on rear door evacuation drills. (*Id*. at 33:2-5).

School District Transportation Coordinator Marie Strempek stated she was unaware of whether there were any specific instructions for dealing with small children during fire drills. (Strempek Dep., at 30:16-23). Neither did NPSD have meetings with teachers, students, or bus drivers on how to properly conduct the drills. (*Id*. at 35:13-36:8). Furthermore, no one from NPSD informed Strempek of I.R.'s limitations, and there was no formal program in place to track students who would need assistance during a bus evacuation drill. (*Id*. at 42:23-43:9).

The parties have fully briefed both motions for summary judgment, and the matter is now ripe for disposition.

## III. Standard of Review

A district court may "designate a magistrate judge to conduct hearings, including

evidentiary hearings, and to submit to a judge of the court proposed findings of fact and

recommendations for the disposition" of certain matters pending before the court. 28 U.S.C.

§ 636(b)(1)(B). If a party timely and properly files a written objection to a Magistrate Judge's

Report & Recommendation, the District Court "shall make a *de novo* determination of those

portions of the report or specified proposed findings or recommendations to which objection

is made." *Id.* at § 636(b)(1); *see also Brown v. Astrue*, 649 F.3d 193, 195 (3d Cir. 2011);

Local Rule of the Middle District of Pennsylvania 72.3.

Through summary adjudication the court may dispose of those claims that do not

present a "genuine issue as to any material fact." FED. R. CIV. P. 56(a). Summary judgment

"should be rendered if the pleadings, the discovery and disclosure materials on file, and any

affidavits show that there is no genuine issue as to any material fact and that the movant is

entitled to judgment as a matter of law." *Brightwell v. Lehman*, 637 F.3d 187, 194 (3d Cir.

2011).

"As to materiality, ... [o]nly disputes over facts that might affect the outcome of the

suit under the governing law will properly preclude the entry of summary judgment."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202

(1986). The party moving for summary judgment bears the burden of showing the absence

of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106

S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

Once the movant has made its showing, the non-movant must offer specific facts

contradicting those averred by the movant to establish a genuine issue of material fact.

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990).

"Inferences should be drawn in the light most favorable to the non-moving party, and where

the non-moving party's evidence contradicts the movant's, then the non-movant's must be

taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir.

1992), *cert. denied* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993).

## IV. Analysis

### a.  Defendants Peirce and Pocono Transportation, Inc.

Under Pennsylvania law, a plaintiff must prove the following elements to prevail on a

negligence claim: (1) the defendant had a duty to conform to a certain standard of conduct;

(2) the defendant breached that duty; (3) such breach caused the injury in question; and (4)

the plaintiff incurred actual loss or damage. *Pyeritz v. Commonwealth*, 32 A.3d 687, 692

(Pa. 2011).  Defendants Peirce and PTI claim that they owed no duty to I.R. during the

execution of the bus evacuation drill because it was Defendant NPSD's decision to conduct

the drill.  However, regardless of whose decision it was to conduct the drill, Plaintiffs claim

that Peirce and PTI[2] were negligent in its *execution*.

---

[2] Peirce "formed the corporation" of PTI, a family business that his parents had owned before him. (Peirce Dep., 7:15-24).  In or around September 1, 2006, Peirce sold PTI to one, Aaron Sepkowski (*Id.* at 17:6-20).  Peirce

Duty, in any given situation, is predicated upon the relationship existing between the parties at the relevant time. Where the parties are strangers to each other, such a relationship may be inferred from the general duty imposed on all persons not to place others at risk of harm through their actions. The scope of this duty is limited, however, to those risks which are reasonably foreseeable by the actor in the circumstances of the case.

*Roche v. Ugly Duckling Car Sales, Inc.*, 879 A.2d 785, 789-90 (Pa. Super. Ct. 2005) (citing *Zanine v. Gallagher*, 497 A.2d 1332, 1334 (Pa. 1985)) (internal citations omitted). Thus, at a minimum, complete strangers owe each other a duty of care to not place one another at risk of harm. In the case of carriers, however, the duty is greater: "a carrier, whether common or contractual, is held to the highest degree of care in carrying its passengers to their destination and enabling them to alight safely." *Knoud v. Galante*, 696 A.2d 854, 856 (Pa. Super. Ct. 1997) (citing *Coyne v. Pittsburgh Rys. Co.*, 141 A.2d 830, 832 (Pa. 1958)). "A carrier's duty ends when the passenger has had a reasonable opportunity to alight and pass out of danger. *Id.* (internal citations and quotation marks omitted). And when a carrier's passengers are students, the duty is even stricter. Thus, "[Defendant] by contract accepted a grave responsibility to carry children to and from school, and in discharge of this duty it was bound to exercise the highest practical degree of care." *Lebanon Coach Co. v. Carolina Cas. Ins. Co.*, 675 A.2d 279, 291 (Pa. Super. Ct. 1996) (citing *Vogel v. Stupi*, 53 A.2d 542, 545 (Pa. 1947)).

---

stayed on with the company for an additional year to assist Sepkowski. On the date of I.R.'s accident, Peirce was acting as a substitute driver for June Cole. (*Id.* at 19:20-20:6). He drove the bus only in the afternoon, not the morning. (*Id.* at 34:17-19).

The Pennsylvania School Bus Driver's Manual (Doc. 56, Ex. B) requires a bus driver to "[w]alk to the rear of the bus and face [the] rear door" during a "Rear Emergency Door Evacuation Drill." (*Id*. at H-14, ¶ 5). Though state law requires all students who ride a public school bus to participate in these drills, "[s]tudents who are injured, disabled, or in a condition that may be aggravated by jumping out of the bus . . . should not be required to participate in the drill." (*Id*. at H-14, 15, ¶ 11). Though I.R. never expressed a desire to sit out of the drill (Peirce Dep. at 59:15-18), Peirce did not inform the students about the exception to the requirement that all students must participate in the drill. (*Id*. at 29:8-10). Instead, he said, "today, we're all going to go out the rear emergency door. We're all familiar with the front. We go in and out of it twice a day. We're going to use the back door." (*Id*. at 26:7-11).

Despite his extensive experience in the bussing business (*Id*. at 7:11-13; 23:11-16; 24:19-20), Peirce admitted that he did not follow the Manual when conducting the drill on September 19, 2006. He was "right up in the front of the bus by the driver's seat" when "[s]ome of the other students" told him that "one of the students was hurt in the back." (*Id*. at 26:18-25).

His reason for conducting the drills in the matter he did is that he has "[t]he children need – part of doing the drill is so that they get hands-on experience doing it. I might not be able to help them in the rear – in the real emergency, or any driver." (*Id*. at 30:23-31:4). He further explained that he remained in the front because in his experience, there are some

9

children who "want to be the bus clown" and crawl under the seats to avoid participating in

the drill. (*Id.* at 32:9-12). Based on Peirce's own deposition testimony, he did not follow the

proper procedures for conducting a rear emergency door evacuation drill.

Finally, Peirce stated that no representative of the state had ever tested him on rear

door evacuation drills (*Id.* at 33:2-5), and he was not aware that any of the students on his

bus had "special needs." (*Id.* at 25:1-4). Whether or not he was aware of I.R.'s condition is

irrelevant for the purposes of a negligence analysis. A tortfeasor "takes his victim as he

finds him, and is liable for the full extent of the damage he has inflicted, even if it is greater

than he could have foreseen because the plaintiff was particularly susceptible injury." *Tabor*

*v. Miller*, 389 F.2d 645, 647-48 (3d Cir. 1968) (citing *Alexander v. Knight*, 177A.2d 142, aff'g

on opinion below 25 Pa. Dist. & Co. R. 2d 649 (C.P. Philad. 1962)). Based on the

foregoing, the Court will adopt Judge Mannion's recommendation with respect to Plaintiffs'

negligence claim against Defendants Peirce and PTI and go one step further.

In denying Peirce's and PTI's motion for summary judgment based on Peirce's

admissions to liability that he did not follow the School Bus Driver's Manual when

conducting the evacuation drill, the Court notes that there is nothing left to adjudicate on

Plaintiff's negligence claim with respect to liability. Plaintiffs, however, did not move for

summary judgment on their negligence claim, so the Court will grant summary judgment *sua*

*sponte* to Plaintiffs as to liability on this issue. *See* FED. R. CIV. P. 56(f)(1). Though notice

normally is required to the losing party, a district court may enter summary judgment *sua*

*sponte* without notice under certain circumstances. *Gibson v. Mayor and Council of City of Wilmington*, 355 F.3d 215, 224 (3d Cir. 2004). Those circumstances exist here: "the presence of a fully developed record, the lack of prejudice, or a decision based on a purely legal issue." *Id*.[3]

Insofar as there is no genuine issue of material fact on this point, further factual development is unnecessary. I.R.'s version of what transpired on the day of the evacuation drill comports with Peirce's deposition testimony. (*See generally* I.R. Dep.). Because of Peirce's statements, no additional witness testimony would be useful as nothing anyone else could say would absolve Peirce of liability. Defendants Peirce and PTI are not prejudiced as they were the moving parties, and by the Court's denial of their motion based on Peirce's admissions, there is nothing left to adjudicate in the case other than damages. Therefore, to notify Defendants that the Court is considering granting summary judgment *sua sponte* in favor of Plaintiffs and to give Defendants a reasonable time to respond would elevate form over substance.

### b. Defendant NPSD

To meet the requirements of a state-created danger claim under the Fourteenth Amendment substantive due process clause, a plaintiff must show (1) the harm ultimately caused was foreseeable and fairly direct; (2) a state actor acted with a degree of culpability

---

[3] The 2010 revisions to the Federal Rules of Civil Procedure formally authorized a district court to *sua sponte* enter summary judgment, recognizing the "procedures that have grown up in practice." FED. R. CIV. P. 56(f) advisory committee's note to 2010 amendment. Without explicitly referring to the amendments, the Third Circuit has continued to recognize the validity of the exceptions to the notice requirement contained in Rule 56(f) post-2010 amendments. *Minnesota Lawyers Mut. Ins. Co. v. Ahrens*, 432 F. App'x 143, 148 (3d Cir. 2011).

that shocks the conscience; (3) a relationship between the state and the plaintiff existed

such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a

discrete class of persons subjected to the potential harm brought about by the state's

actions, as opposed to a member of the public in general; and (4) a state actor affirmatively

used his or her authority in a way that created a danger to the citizen or that rendered the

citizen more vulnerable to danger than had the state not acted at all. *Bright v.*

*Westmoreland Cnty.*, 443 F3d 276, 281 (3d Cir. 2006). Assuming that Plaintiffs have met

elements one and three, the Court will address the second and fourth elements of

conscience-shocking conduct and affirmative action by a state actor.

1. Conduct which Shocks the Conscience

In *Sanford v. Stiles*, the Third Circuit articulated the test by which a district court

should determine whether a state actor's behavior shocked the conscience. 456 F.3d 298

(3d Cir. 2006). The Circuit adopted a sliding scale approach whereby "the state actor's

behavior must always shock the conscience. But what is required to meet the conscience-

shocking level will depend upon the circumstances of each case, particularly the extent to

which deliberation is possible." *Id.* at 310.

> The level of culpability required to shock the conscience increases as the time
> state actors have to deliberate decreases. In a hyperpressurized
> environment, an intent to cause harm is usually required. On the other hand,
> in cases where deliberation is possible and officials have the time to make
> unhurried judgments, deliberate indifference is sufficient. . . . We also
> recognize that there are circumstances involving something less urgent than
> a split-second decision but more urgent than an unhurried judgment.
> Generally, this category will include situations in which the state actor is

12

required to act in a matter of hours or minutes. . . . [In those circumstances,] the defendants [must] disregard a great risk of serious harm.

*Id.* at 309-10 (internal quotation marks and citations omitted). The Third Circuit later summarized the levels as follows: (1) deliberate indifference; (2) gross negligence or arbitrariness that indeed shocks the conscience; or (3) intent to cause harm. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 241 (3d Cir. 2008). Judge Mannion noted that the parties agree the appropriate standard here given the length of time NPSD had to deliberate before conducting the evacuation drill is "deliberate indifference." (Doc. 59, at 14).

It is undisputed that I.R.'s teachers, guidance counselor, and school nurse were well aware of his osteopetrosis and vision problems, and despite this knowledge, no one from NPSD informed Peirce or PTI that I.R. might have difficulty participating in a bus evacuation drill. It is also undisputed that NPSD did not assign teachers to assist students in the bus evacuation drill of September 19, 2006, and Judge Mannion so noted these agreed-upon facts in his R&R. However, it is also undisputed that the School Bus Driver's Manual requires a bus driver to go to the rear of the bus when a rear door evacuation drill is occurring to ensure that the drill is carried out safely and that Peirce did not do so. It is further undisputed that anyone with a physical limitation or disability may be excused from participating in the drill, but I.R. did not voice any objection to participating.[4] I.R.'s mother

---

[4] I.R.'s IEPs indicated that one of his objectives was to ask for academic help when needed (*see, e.g.*, Doc. 53, Ex. A, at 38), and his evaluations noted that he "display[ed] responsibility in requesting assistance and obtaining adapted materials and assistive technology when needed." (*Id.* at 69; *see also* 98). The school nurse also noted that I.R. "was very good about speaking up to the phys ed teacher if he felt there was something he could not participate in." (Sheerer Dep., Doc. 41, Ex. G, at 42:12-14). However, I.R. testified at his deposition that on the day of the

also stated that I.R. "knew better what he was supposed to do and not supposed to do." (E. Robinson Dep. at 20:13-15). I.R. himself stated that he "sat down on the edge of the bus and tried to scoot out" (I.R. Dep. at 36:18-20) from a height of approximately four feet.

Based on Plaintiffs' own statements and the undisputed facts above, the Court concludes that NPSD's conduct was not so "deliberately indifferent" to a substantial risk of serious harm as to shock the conscience. "Life is fraught with risk of serious harm . . . . But [a constitutional] violation may not be predicated on exposure to *any* risk of serious harm; the risk must be substantial." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 258 (3d Cir. 2010) (emphasis in original) (internal citations and quotation marks omitted).[5]

The *Betts* court affirmed the district court's decision that allowing youths to play tackle football without protective equipment, which resulted in the plaintiff's quadriplegia, was not conduct deliberately indifferent to a substantial risk of serious harm. In so affirming, the Third Circuit held that while "quadriplegia is an exceptionally serious harm, . . . Betts has presented no evidence that playing tackle football without equipment poses a substantial risk of serious harm." *Id.* at 257. Likewise, Plaintiffs have presented no evidence that "scooting" off the back of a bus from a height of four feet without the assistance of a teacher poses a substantial risk of serious harm, even with NPSD's knowledge of I.R.'s condition.

---

evacuation drill, he did not object to participating in the drill because he "didn't want [Peirce] to yell at [him] or anything, because [I.R.] heard [Peirce] was a mean bus driver." (I.R. Dep. at 40:13-18).

[5] In *Betts*, the plaintiff had brought an action under both the Eighth Amendment and Fourteenth Amendment. The district court had used the same "shock the conscience" test under both claims in determining that the defendants' conduct did not rise to constitutional violation under either claim. The Third Circuit affirmed the district court's decision under the Eighth Amendment but concluded that the plaintiff's Fourteenth Amendment claim was foreclosed by the "more-specific-provision rule" because his complaints were cognizable under the Eighth Amendment. Therefore, the Circuit did not specifically comment on the district court's analysis under the Fourteenth Amendment, though it was identical to its Fourth Amendment analysis, which the Circuit affirmed.

Unfortunately, the exercise resulted in a closed and transverse fracture of I.R.'s right femur, but that was not such a serious harm that the Court would call it conscience-shocking.

Here, numerous safeguards were in place to ensure the safety of NPSD's students, such as a Policy Manual requiring bus drivers to supervise evacuation drills from the rear of a bus and an exemption from the participation requirement for students with physical limitations. Thus, Plaintiffs have not shown that NPSD's "failure" to guarantee a virtually risk-free evacuation, despite the presence of a safety precaution manual and an exemption for a student such as I.R., posed a substantial risk of serious harm to I.R. Finally, no evidence is on the record to show the frequency or likelihood of injuries occurring from bus evacuation drills without the supervision of teachers in middle and high school to put NPSD on notice that the risk of serious harm to students was substantial.

### 2. Affirmative Action by State Actors

The Supreme Court has held that "[i]n the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf – through incarceration, institutionalization, or other similar restraint of personal liberty – which is the 'deprivation of liberty' triggering the protections of the Due Process Clause." *DeShaney v. Winnebago Cnty. Dep't of Social Srvcs.*, 489 U.S. 189, 200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). In other words, "[l]iability under the state-created danger theory is predicated upon the state's affirmative acts which work to the plaintiff's detriment in terms of exposure to danger." *D.R. by L.R. v. Middle Bucks Area Vocational Tech. Sch.*, 972 F.2d

15

1364, 1374 (3d Cir. 1992). "But a specific and deliberate exercise of state authority, while

necessary to satisfy the fourth element of the test, is not sufficient. There must be a direct

causal relationship between the affirmative act of the state and plaintiff's harm." *Kaucher v.*

*Cnty. of Bucks*, 455 F.3d 418, 432 (3d Cir. 2006).

Courts have freely admitted that it is oftentimes difficult to determine where state

action ends and inaction begins:

> We do not want to pretend that the line between action and inaction, between
> inflicting and failing to prevent the infliction of harm, is clearer than it is. If the
> state puts a man in a position of danger . . . and then fails to protect him, it will
> not be heard to say that its role was merely passive; it is as much an active
> tortfeasor as if it had thrown him into a snake pit.

*Ye v. United States*, 484 F.3d 634, 637 (3d Cir. 2007) (citing *Bowers v. DeVito*, 686 F.2d

616, 618 (7th Cir.1982)).

Keeping these standards in mind, the Court will now examine several cases in which

the Supreme Court and Third Circuit have applied such standards in determining whether a

state actor exercised his or her authority to take affirmative action that was the "but for"

cause of the plaintiff's injury.

In *DeShaney*, the local Department of Social Services ("DSS") received a report that

Joshua DeShaney was being physically abused by his father, and following an incident in

which Joshua was treated at a hospital for multiple bruises and abrasions, DSS obtained a

court order which placed Joshua in the temporary custody of the hospital. 489 U.S. at 192;

109 S.Ct. 998. However, after an inquiry determined there was insufficient evidence of child

abuse, Joshua was returned to his father's care. *Id.* Over the next several months, despite

evidence of ongoing abuse, DSS did nothing to intervene. *Id.* Eventually, Joshua's father,

Randy, beat his son so severely that Joshua suffered permanent brain damage. *Id.*

Despite the tragic facts of the case, the Supreme Court concluded that the "most that can

be said of the state functionaries in this case is that they stood by and did nothing." *Id.* at

203, 109 S.Ct. 998.

> The [Due Process] Clause is phrased as a limitation on the State's power to
> act, not as a guarantee of certain minimal levels of safety and security. It
> forbids the State itself to deprive individuals of life, liberty, or property without
> "due process of law," but its language cannot fairly be extended to impose an
> affirmative obligation on the State to ensure that those interests do not come
> to harm through other means. Nor does history support such an expansive
> reading of the constitutional text.

*Id.* at 195; 109 S.Ct. 998. Therefore, "[w]hile the State may have been aware of the

dangers that Joshua faced in the free world, it played no part in their creation, nor did it do

anything to render him more vulnerable to them." *Id.* at 201, 109 S.Ct. 998.

The Third Circuit likewise condemned the state actor school defendants in *D.R by*

*L.R.* who had allegedly been aware that the plaintiffs, two female high school students, had

been verbally, physically, and sexually molested routinely by multiple male classmates over

the course of several months in a unisex bathroom and class darkroom, but did nothing to

intervene. 972 F.2d at 1373. "We readily acknowledge the apparent indefensible passivity

of at least some school defendants under the circumstances. Accepting the allegations as

true, . . . they show nonfeasance but they do not rise to the level of a constitutional

violation." *Id.* at 1376. There, the harm was caused the by private actors (*i.e.*, the male students), not state actors. As such, the Court determined that the plaintiffs had failed to show "as required under *DeShaney*, that the school defendants either impermissibly limited the freedom of the plaintiffs to act on their own behalf, or barred their access to outside support. Nor do they demonstrate that defendants violated a constitutional duty by creating or exacerbating the danger posed by the student defendants." *Id.*

The facts before the Third Circuit in *Bright v. Westmoreland County* were even more compelling, and yet, the Court did not accept the plaintiff's state-created danger theory. In *Bright*, Charles Koschalk, had pled guilty to corrupting the morals of the plaintiff's twelve-year-old daughter and had been sentenced to 23 months of probation. 443 F.3d at 278. However, in direct violation of the terms of his probation, he attempted to re-establish contact with his victim on numerous occasions. *Id.* The plaintiff asked a police officer to arrest Koschalk, and the officer assured him that immediate action would be taken. *Id.* at 279. Koschalk's probation officer had already initiated proceedings to have Koshalk's probation revoked. *Id.* at 278. However, in the intervening ten weeks between her report and the probation hearing, Koschalk murdered the plaintiff's other daughter, Annette, in retaliation for the plaintiff's attempts to keep Koschalk away from the plaintiff's older daughter. *Id.* at 279. In affirming the district court's dismissal of the complaint, the Third Circuit held that "[t]his theory of liability based solely on a failure of the state to act is clearly foreclosed by *DeShaney*." *Id.* at 284. "The reality of the situation described in the complaint

is that what is alleged to have created a danger was the failure of the defendants to utilize

their state authority, not their utilization of it." *Id*. Citing *DeShaney*, the *Bright* Court held

that "the Due Process Clause did not require that Westmoreland County 'become the

permanent guarantor' of the Bright family's safety from private violence any more than it

required Winnebago County to 'become the permanent guarantor' of Joshua's safety from

the same sort of harm." *Id*. at 285. Again, the harm was caused by a private actor, and the

state had done nothing to prevent the plaintiff from taking precautions to protect his family

from Koschalk. "It is *misuse* of state authority, rather than a failure to use it, that can violate

the Due Process Clause." 443 F.3d at 292-93 (emphasis added).

Similarly, in *Ye*, the plaintiff had complained to Defendant Dr. Kim of shortness of

breath, coughing, and discomfort in his upper body area. 484 F.3d at 635. After prescribing

Ye cough medication, Dr. Kim assured Ye's son that "there is nothing to worry about" and

that Ye would be "fine." *Id*. However, later that day, Ye's son found Ye unconscious and

doctors determined that Ye actually was suffering from congestive heart failure and had

experienced a myocardial infarction. *Id*. Despite emergency medical intervention, the

damage had been done, and the plaintiff wound up in a skilled nursing care center and was

permanently on a ventilator. *Id*. Several experts said that had Dr. Kim done a proper

examination, he could have prevented Ye's ultimate condition. *Id*. at 636. Despite these

facts and evidence, based on the Supreme Court's reasoning in *DeShaney* and its own

precedent, the Third Circuit concluded "Dr. Kim did not deprive Ye of his liberty, and therefore did not violate the substantive component of the Due Process Clause." *Id.* at 643.

Two of the few instances in which the Third Circuit has found a cause of action for state-created danger are *Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir. 1996) and *Rivas v. City of Passaic*, 365 F.3d 181 (3d Cir. 2004). In *Kneipp*, the plaintiff, Samantha Kneipp, and her husband, Joseph, were stopped by the police on a wintry evening for causing a disturbance on a highway. 95 F.3d at 1201. Both appeared intoxicated, but the police let Joseph go home first because he had to care for the couple's infant. *Id.* at 1201-02. He assumed the police would either arrest his wife or bring her home, but instead, after detaining her for a few more minutes, they released her in her heavily inebriated state to walk the rest of the way home alone. *Id.* at 1202. Soon afterward, she was found unconscious at the bottom of an embankment. *Id.* at 1203. Her exposure to the cold had caused anoxia, leading to permanent brain damage. *Id.* The damage severely impaired several basic body functions: the plaintiff could not even swallow on her own, and she was left virtually blind. *Id.* at n.16. However, unlike in *D.R. by L.R.*, *Bright*, and *Ye*, the Third Circuit in *Kneipp* found that the police had affirmatively acted to increase Samantha's risk of harm:

> there is sufficient evidence in the summary judgment record to show that Officer Tedder and the other police officers used their authority as police officers to create a dangerous situation or to make Samantha more vulnerable to danger had they not intervened. The conduct of the police, in allowing Joseph to go home alone and in detaining Samantha, and then sending her home unescorted in a seriously intoxicated state in cold weather, made Samantha more vulnerable to harm. It is conceivable that, but for the intervention of the police, Joseph would have continued to escort his wife

back to their apartment where she would have been safe. A jury could find that Samantha was in a worse position after the police intervened than she would have been if they had not done so. As a result of the affirmative acts of the police officers, the danger or risk of injury to Samantha was greatly increased.

*Id.* at 1209.

In *Rivas*, EMTs responded to a 911 call that the decedent, Mr. Rivas, was experiencing seizures. The EMTs alleged that upon their arrival at the Rivas home, Mr. Rivas assaulted one of them. 365 F.3d at 185. In response, the EMTs called the police, who arrived and restrained Mr. Rivas. There was some evidence on the record that though the EMTs reported the assault by Mr. Rivas to the police, they omitted any reference to his seizures, and the EMTs admitted that placing someone who is prone to seizures in restraints could increase his risk of harm. *Id.* at 186. It apparently took several police officers to restrain Mr. Rivas, and in violation of proper protocol, they placed him face-down instead of face-up on a stretcher. Furthermore, also against proper protocol, the police carried him down the stairs of the apartment head-first instead of feet-first. The EMTs allegedly observed these violations of protocol but said nothing. *Id.* Once the paramedics arrived, they noticed that Mr. Rivas was face-down on the stretcher and instructed the police to turn him over. *Id.* at 188. When they did so, the paramedics discovered Mr. Rivas was not breathing, and despite their efforts, he was pronounced dead soon afterwards. *Id.* Because of the facts in dispute, the Third Circuit affirmed the district court's denial of summary judgment in favor of the defendant state actors. *Id.* at 184. Furthermore, the

Court determined that the EMTs' actions of (1) calling the police to report Rivas's assault, (2) failing to inform them of his condition, and (3) allowing the police to violate emergency response protocol "when taken together, created an opportunity for harm that would not have otherwise existed." *Id.* at 197.

Having examined the fact patterns in *DeShaney*, *D.R.*, *Bright*, and *Ye*, and contrasted them with those in *Kneipp*[6] and *Rivas*, this Court concludes that this case provides yet another example of state inaction, rather than an instance of misuse of state authority that placed I.R. in greater danger than he otherwise would have been in. Before transferring the case to the undersigned judge, Judge Conner had given Plaintiffs the benefit of the doubt when he allowed them to pursue their substantive due process claim against NPSD despite NPSD's motion to dismiss. (Doc. 32).

However, an examination of both the Complaint and the facts in evidence produced during discovery shows that at most, the state actors did nothing to prevent I.R.'s injuries from occurring. The only action that took place was NPSD's decision to obey state law[7] and conduct a bus evacuation drill. All other "acts" were actually failures to act: NPSD "failed" to establish a policy to ensure that handicapped students would be safe during such a drill. NPSD "failed" to provide a teacher to assist I.R. in evacuating the rear emergency door of the bus. NPSD "failed" to inform Peirce and PTI that I.R. had a handicap which would limit

---

[6] *Kneipp* pre-dated *Bright* and used slightly different variations of the four-part elemental test by using "willful disregard" for the safety of the plaintiff in lieu of conscience-shocking conduct. *See also Sanford*, 456 F.3d at 308 for a discussion of the standards applied in *Rivas*. However, for the purposes of this Court's analysis, an examination of those differences is unnecessary because the affirmative acts taken by the defendants in *Kneipp* and *Rivas* are qualitatively different from the facts in this case.

[7] 24 Pa. Cons. Stat. § 15-1517(d).

his ability to participate in the drill safely on his own. (Strempek Dep., at 30-42). These actions (or inactions) did not *create* a danger to I.R., and these failures to act were not the "but for" cause of I.R.'s injuries. *See Ye*, 484 F.3d at 639 (citing *Bright*, 443 F.3d at 281-82).

In their brief in opposition to NPSD's objections, Plaintiffs contend that "the fire drill that injured I.R. was the result of state actors exercising their authority" (Doc. 63, at 18) which created a danger to I.R. Plaintiffs' argument that NPSD's compliance with state law in carrying out a bus evacuation drill is, in and of itself, a creation of a danger to I.R. is unpersuasive. If the Court were to accept this argument, NPSD could be exposed to substantive due process liability each and every time it conducted a bus evacuation drill and a student was injured. This cannot be. In addition, Plaintiffs claim that NPSD "acted affirmatively to coerce I.R. to exit the rear of the bus." (*Id*. at 19). There is no evidence in the record to reflect coercion by any NPSD officials. Rather, the most that can be said of NPSD is that it "did nothing to address these dangers in planning and executing the bus fire drill," as Plaintiffs themselves state. (*Id*. at 2).

Finally, the state did nothing to restrict either I.R.'s freedom or his parents' freedom. The Court in *D.R. by L.R.* determined there was insufficient evidence that "the school defendants either impermissibly limited the freedom of the plaintiffs to act on their own behalf, or barred their access to outside support." 972 F.2d at 1376; *see also Brown v. Grabowski*, 922 F.2d 1097, 1116 (3d Cir. 1990). The same applies to the situation here. NPSD did nothing to restrict either I.R. from objecting to participating in the evacuation drill.

Neither did NPSD prevent I.R.'s parents from requesting that he be excused from any evacuation drills or that a teacher be on hand to assist him while participating.

Therefore, because the Court determines that NPSD's conduct did not shock the conscience and that NPSD did not engage in affirmative action that placed I.R. in greater danger than he otherwise would have been in, it will grant summary judgment to NPSD on Plaintiff's substantive due process claim. In granting summary judgment in favor of NPSD, the Court notes that the district courts in *Bright* and *D.R. by L.R.* had dismissed the complaints at the motion to dismiss stage and the Third Circuit affirmed, whereas in *Ye*, the Third Circuit held that the district court had erred in denying summary judgment in favor of defendant Dr. Kim. In *DeShaney*, the district court had granted summary judgment in favor of the defendant state actors, the Seventh Circuit Court of Appeals affirmed, and ultimately, so did the United States Supreme Court.

Whether or not this case could have been dismissed earlier, it is now ripe for disposition in favor of Defendant NPSD because there was no state-created danger under the difficult and stringent standard which must be met to show a violation of substantive due process. Therefore, the Court will reject Judge Mannion's R&R with respect to Plaintiffs' substantive due process claim predicated on a state-created danger theory against NPSD.

## V. Conclusion

For the foregoing reasons, the Court will adopt in part and reject in part Judge Mannion's R&R. The Court denies Defendants' Peirce's and PTI's motion for summary

judgment on Plaintiffs' negligence claim and grants Defendant NPSD's motion for summary judgment on Plaintiff's substantive due process claim under a theory of a state-created danger.  The Court *sua sponte* grants summary judgment as to liability in favor of Plaintiffs on their negligence claim against Peirce and PTI.  Only Plaintiffs' damages with respect to their negligence claim against Defendants Peirce and PTI remain to be determined by a jury.  A separate Order follows.

Robert D. Mariani
United States District Judge